Commonwealth to use of Nahrgang *v.* American Employers Insurance Co., Appellant.

Argued March 27, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Herbert A. Barton,* with him *Swartz, Campbell & Henry,* for appellant.

*James L. Price,* with him *Richman, Price & Jamieson,* for appellee.

OPINION BY FLOOD, J., April 12, 1962:

John J. Nahrgang, Jr., a real estate dealer who was also a notary public, defrauded his brother, William L. Nahrgang, and William's wife, by obtaining from him and converting to his own use three checks totalling $7000. Each check was turned over to John in payment for a mortgage, which John told William he had available. In each case, John forged the mortgage, notarized the forged signatures and some time after he got the check delivered the mortgage to William. Suits were instituted to recover on a notarial bond issued by appellant as surety for John. The cases were tried by the court below, sitting without a jury, which found in favor of the plaintiff. The appellant filed motions for a new trial or for judgment n.o.v. and has appealed

from orders of the court en banc overruling these motions and entering judgment for the plaintiff.

1. The first two transactions consisted of the delivery by William to John during December, 1952, of checks in the sums of $3500 and $2500, respectively, payable to the order of Commonwealth Title Company. John used each of these checks to pay certain obligations due the title company in other unrelated transactions. In each case after delivering the check to the title company he forged the mortgage which William expected to get and notarized the forged signatures of the purported mortgagors. He placed the two forged mortgages of record on February 9, 1953, and later delivered them to William. In each instance John concealed the fraud by making periodic payments of interest.

Since in each case the check was delivered to John before the time fixed for settlement and before the mortgage had been delivered to or seen by William, it cannot be said that the checks were delivered on the faith of the notarization of the signatures on the mortgages. Since William had not seen the mortgages at the time of the delivery of the checks it follows that he gave them to John in reliance upon John's honesty and in the belief at the time that John would deliver valid mortgages to him in return for the checks.

The contrary opinion of the court below, sitting en banc, is based, at least in part, upon the supposition "that two checks were drawn to the order of the Commonwealth Land Title Insurance Company only after the mortgage instruments were first produced and represented to be genuine and authentic". But this is not supported by the testimony. William's testimony is that he handed over the checks for each mortgage before he saw the mortgage, and before settlement was to be made. No notations or instructions to the title company indicated that the use of checks payable to it was

in any way restricted. The forgery of the mortgages and the notarization of the forged signatures apparently were intended to lull William into a sense of security after he already had been defrauded. This was further accomplished by payment thereafter by John to William of the amount of the interest called for in the forged mortgages.

There is no proof that William relied upon the notarial attestation of the signatures of the purported mortgagors when he gave the checks to John. He relied rather upon his brother's honesty. Consequently, the defendant surety company cannot be compelled to make good his loss: *Commonwealth to use v. Turner,* 340 Pa. 468, 17 A. 2d 352 (1941). In that case the plaintiff was denied recovery because there was no proof that she sustained her loss through reliance upon the notary acting in his official capacity, as distinguished from reliance upon him as an individual. As the Supreme Court said in that case (340 Pa. 475, 17 A. 2d 355-356) : "The mere fact that the mortgage papers delivered to her bore a false certification, which the surety admitted, was not sufficient to establish the principal's liability in his official capacity. She had entrusted him with her funds in July. In August, he gave her the forged documents, containing his false acknowledgment. Consequently, she parted with her money, not in reliance upon the notarial certification, but upon her confidence in Turner as an individual."

The plaintiff relies upon certain language which the Supreme Court used in the *Turner* case to distinguish *Hungate v. Wells,* 129 Cal. App. 133, 18 P. 2d 64 (1933). The Supreme Court said that there was a finding of fact in that case that the notary, at the time he received the funds entrusted to him, had conceived a plan to defraud the plaintiff by misuse of his notarial powers. The Supreme Court went on to say that that fact had not been shown in the case before it, that

there was no averment that the use-plaintiff had relied upon Turner's official capacity in giving him her money to invest or that he had formed an intention to defraud her at that time by execution of a false acknowledgment, and that, in view of the lapse of time between his receipt of the money and the delivery of the forged papers, it could not be assumed in the absence of proof that the transactions were integrated.

We have read the *Hungate* decision and discover no finding such as is described by the Supreme Court. The opinion in that case discloses only that the plaintiff gave a notary a check payable to a title company, which subsequently was cashed, and that for this money she received a forged note and deed of trust containing the notary's false acknowledgment. These findings and the court's statement that the notary "conceived the scheme of defrauding respondent of the sum of $1,000 and in carrying out his plan forged . . . the deed of trust and the promissory note and executed a false notarial certificate . . ." do not indicate that the payment and receipt of the forged instruments in the *Hungate* case were separate transactions connected only by an intention on the part of the notary at the inception of the scheme to use his notarial powers in the transaction. The plaintiff in the *Hungate* case may have received the forged documents in direct exchange for the check, or a title company may have paid out the money as her agent in reliance upon the documents. Under the circumstances we cannot accept the *Turner* decision as authority for allowing recovery where the payment of the money and the delivery of the notarized documents are connected only by an intention on the part of the notary at the inception of the scheme to use his notarial powers in the transaction.

In *Commonwealth v. Doak*, 352 Pa. 380, 42 A. 2d 826 (1945), also relied upon by the plaintiffs, the money was not directly appropriated by the thief, but

was turned over to the title company, which disbursed it upon the faith of a false notarization of the signature to the mortgage of a non-existent person. Here the court properly found that the title company was the plaintiff's agent for paying out the money, and that it paid the money out in reliance upon the notary's false certificate of acknowledgment. Similarly, in *Commonwealth to use v. United States Fidelity and Guaranty Co.*, 364 Pa. 543, 73 A. 2d 422 (1950), and *Commonwealth to use v. Maryland Casualty Company*, 369 Pa. 300, 85 A. 2d 83 (1952), the money was paid out by the title company in reliance upon the attestation of the false acknowledgment by the notary. There was no such reliance when the payments were made in this case.

We conclude that there is no testimony from which it could be found that the plaintiff turned over either of these two checks in reliance upon John Nahrgang's false notarizations of the forged signatures of the purported mortgagors.

2. In the third transaction William delivered to John a check for $1000 to the order of cash on August 4, 1953. John converted the proceeds to his own use and later forged another mortgage, notarized it under date of August 18, 1953, and recorded it on September 23, 1953. So far as the pleadings and the evidence in the case go, this transaction is the same as the other two. There was no reliance upon the notarization of the mortgage which William expected to receive when he delivered the $1000 check to John.

While there might conceivably be liability on the surety's bond for the $1000 advanced for the third mortgage if it appeared that this money would not have been advanced if William had not earlier received the first two forged mortgages notarized by John, yet the fact of reliance upon the earlier notarizations was neither pleaded nor proved. The plaintiff pleaded only that

John wrongfully executed his notarial acknowledgment to an alleged mortgage covering 3153 Unruh Avenue, Philadelphia, in the sum of $1000, that no such mortgage was created and that the signatures to the mortgage were forged by John who thereby fraudulently obtained $1000 from William. There was no pleading of any reliance on what had gone before with relation to the other two mortgages. William did not testify that he relied upon false notarizations on the first two mortgages in later advancing the $1000. He testified only that he relied upon the signatures, notarizations and recordings of these documents in advancing the $3500 and $2500, an obviously false or inaccurate statement. He had the burden of proof and did not sustain it.

The orders are reversed and the record is remanded with direction to enter judgment for the defendant in each case.